UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| JUNE M. SHAMP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:14 CV 58 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This action is before the court for judicial review of the final decision of the defendant Acting Commissioner of Social Security denying the application of plaintiff June N. Shamp for a disability benefits under Titles II and XVI of the Social Security Act. The parties have consented to the exercise of plenary authority by the undersigned Magistrate Judge under 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff June M. Shamp, born September 27, 1974, applied for disability benefits under Titles II and XVI of the Social Security Act on September 1, 2001. (Tr. 9.) Plaintiff alleged an onset date of disability of December 13, 2009, due to herniated disk, depression, panic attacks, nerve damage to the right and left hips, diabetes, degenerative disk disease, and carpal tunnel syndrome. (Tr. 220–34.) Plaintiff's claim was initially denied on January 30, 2012. (Tr. 104–11.) On February 10, 2012, plaintiff filed a Request for a Hearing. (Tr. 119–20.) Plaintiff appeared and testified at a hearing before an ALJ on March 4, 2013, and on March 25, 2013, the ALJ found that plaintiff was not disabled. (Tr. 6–25.) Plaintiff exhausted all of her administrative remedies when the Appeals Council denied her Request for Review on April 4, 2014. (Tr. 1–4.) Thus, the decision of the ALJ stands as the final decision of the defendant Commissioner.

## II. MEDICAL HISTORY

### A. Medical Records

On January 10, 2008, plaintiff a magnetic resonance imaging (MRI) of her back. Paula George, M.D., interpreted the results of the MRI and found small right paracentral disc herniation at L5-S1 with a mild impression on the right ventral thecal sac and right S1 nerve root; there was no neural stenosis. (Tr. 372–73.)

On January 28, 2008, plaintiff was examined by Joel T. Jeffries, M.D., at the Columbia Region Orthopaedic Clinic with a chief complaint of right side low back pain. Dr. Jeffries noted that plaintiff was pleasant and cooperative. Dr. Jeffries' impression of plaintiff's condition was lumbar radiculopathy.[1] (Tr. 276–79.)

On April 2, 2008, plaintiff again visited Dr. Jeffries for review the MRI findings. Dr. Jeffries diagnosed lumbar disk degeneration with small disk protrusion to the right at L5-S1. Dr. Jeffries' treatment included a right L5-S1 transforaminal epidural steroid injection. (Tr. 280–81.)

On July 9, 2008, plaintiff saw Dr. Jeffries with a chief complaint of low back pain. Plaintiff rated her pain at 2 out of 10. Dr. Jeffries' physical examination revealed no significant abnormality in the low back region. Dr. Jeffries recommended a lifting restriction of twenty pounds and physical therapy three times a week for eight weeks. (Tr. 282–83.)

On August 13, 2008, plaintiff saw Dr. Jeffries for a follow-up appointment. Dr. Jeffries noted that plaintiff had been in physical therapy and "has enjoyed substantial diminution in her symptoms" and that plaintiff rated the pain as a 1 out of 10. Plaintiff denied any lower extremity symptoms. Dr. Jeffries noted that plaintiff's low back pain was improving. Dr. Jeffries further noted that "[plaintiff] will be returned to work without restriction." (Tr. 284–85.)

On September 25, 2008, plaintiff visited Dr. Jeffries with a complaint of ongoing back discomfort. Dr. Jeffries noted that plaintiff missed the last two weeks of therapy due to "family conditions." Dr. Jeffries documented that plaintiff was pleasant and cooperative and that her lower extremity motor strength was normal. Dr. Jeffries noted that his impression was "mechanical low back pain, improved" and that he felt plaintiff was at maximum medical improvement. Dr. Jeffries recommended that plaintiff continue working without restriction.

---

[1] Radiculopathy refers to disorder of the spinal nerve roots and neuropathy refers generally to a disorder affecting any part of the nervous system. See generally Stedman's Medical Dictionary 1313, 1622 (28th ed. 2007).

Additionally, Dr. Jeffries noted that he discussed the difference between impairment and disability with plaintiff and that in his opinion, plaintiff sustained a permanent partial impairment of three percent. (Tr. 286–87.)

On October 20, 2008, plaintiff saw Dr. Jeffries with a chief complaint of increased back pain. Dr. Jeffries noted that plaintiff was pain free at times and that she was able to find a position of comfort to address her pain. Dr. Jeffries' treatment plan included a home exercise program and for plaintiff to continue to work without restriction. (Tr. 288–90.)

On December 2, 2008, plaintiff returned to Dr. Jeffries for a follow-up appointment. Dr. Jeffries noted that plaintiff was doing reasonably well and should continue to work without restrictions. (Tr. 291.)

On January 7, 2009, plaintiff visited the Pike Medical Clinic, complaining of muscle cramping, excessive urination, and a possible tuberculosis exposure. The records do not state the locations of the muscle cramping. The records also do list the name or qualifications of the treating provider. (Tr. 347–48.)

On February 5, 2009, plaintiff again visited the Pike Medical Clinic with a complaint of low back pain. The provider prescribed Vicodin and Skelaxin for the pain. Plaintiff also received an injection of Depo-Medrol in the right hip to treat her pain. (Tr. 346.)

On June 8, 2009, plaintiff returned to Dr. Jeffries' office. Plaintiff complained of increased back pain and dysesthesias (impairment of sensitivity) radiating down her left lower extremity. Dr. Jeffries noted that plaintiff was pleasant and cooperative. Dr. Jeffries stated he did not want any additional treatment for plaintiff's back pain. Dr. Jeffries' treatment plan included a home exercise program and continuing working without restrictions. (Tr. 292–94.)

On July 15, 2009, plaintiff again returned to Dr. Jeffries' office. Plaintiff reported that her lower extremity pain was now more of a tingly sensation. Dr. Jeffries noted his impression of work-related back pain and lumbar disk degeneration and stated that plaintiff could continue to work without restriction. (Tr. 295–96.)

On August 19, 2009, plaintiff visited Dr. Jeffries, who noted that plaintiff experienced "spontaneous improvement in her condition" and that she had returned to work without restriction and was doing reasonably well. Dr. Jeffries also documented "I think that it is also reasonable to expect that [plaintiff] will have episodic back pain. She should continue her home exercise program. She is not desirous of injections or surgical intervention." (Tr. 297–98.)

On November 25, 2009, plaintiff went to the Arthur Center for an initial visit. The provider's impression was that plaintiff was depressed. The treatment plan included Prozac (an antidepressant) and hydroxyzine (an anti-anxiety drug). (Tr. 467–68.)

On May 8, 2010, plaintiff returned to the Arthur Center for medication management. Andrea Earlywine, APN, prescribed Prozac, Vistaril (hydroxyzine), and trazodone (an antidepressant). (Tr. 465–66.)

On June 24, 2010, plaintiff visited the Arthur Center for a follow-up appointment. Nurse Earlywine reported that plaintiff had recently filed for divorce and her nerves had been bad. She noted that plaintiff's mood appeared anxious and depressed. She stated that plaintiff's memory was intact and that she had no psychosis. Nurse Earlywine discontinued the trazodone and increased the Prozac dosage. (Tr. 464.)

On July 23, 2010, plaintiff returned to the Arthur Center and saw Nurse Earlywine. Nurse Earlywine noted that plaintiff rated her depression as 2 or 3 out of 10. She reported that plaintiff's mood was stable and that there was no psychosis. Nurse Earlywine's treatment plan included Prozac, hydroxyzine, and Rozerem (a sleep agent). (Tr. 463.)

On August 2, 2010, plaintiff returned to Wilbers Family Care Clinic with a chief complaint of back pain. Nurse Swoboda's treatment plan consisted of ibuprofen and Tylenol. (Tr. 388.)

On January 17, 2011, plaintiff returned to the Wilber Family Care Clinic for a follow-up appointment. Nurse Swoboda noted that plaintiff complained of anxiety. (Tr. 387.)

On May 5, 2011, plaintiff visited the Emergency Department at Hermann Area District Hospital complaining of back pain. Jaya Uppal, M.D., examined plaintiff and ordered an x-ray of the lower back and prescribed Toradol for pain. Dr. Uppal noted that the x-ray showed L5-S1 degenerative disc disease with facet hypertrophy and no acute fracture or subluxation. Dr. Uppal prescribed Vicodin for pain and discharged plaintiff noting that plaintiff's condition was improved. (Tr. 334–41.)

On June 20, 2011, plaintiff visited Thomas J. Spencer, Psy.D., at Associated Behavioral Consultants for a psychological evaluation to assist in determining Medicaid eligibility. Dr. Spencer noted that plaintiff complained of being depressed. Dr. Spencer opined that plaintiff had a mental illness with a duration that could exceed twelve months, "but with appropriate treatment and compliance, prognosis likely improves." Dr. Spencer further noted that plaintiff's daily

functioning included fixing lunch, cleaning the house, watching movies, and fixing dinner. Additionally, Dr. Spencer reported that plaintiff's flow of thought was intact and relevant and that plaintiff's ability to relate was cooperative. (Tr. 352–54.)

On August 29, 2011, plaintiff returned to Wilbers Family Care Clinic to review the results of prior bloodwork. Londa Y. Swoboda, APRN, noted that plaintiff was at a "very high risk for a stroke or heart attack." Nurse Swoboda documented that the treatment plan included prescribing metformin (an antidiabetic drug) and Klonopin (to treat panic attacks) for plaintiff. Nurse Swoboda further noted that plaintiff should keep her appointment in Mexico, Missouri, to see if those providers wanted to keep her on Klonopin. (Tr. 385–86.)

On September 28, 2011, plaintiff visited Wilbers Family Care Clinic. Nurse Swoboda's assessment revealed low back pain. Nurse Swoboda's administered an injection of Depo-Medrol and referred plaintiff to Dr. Jeffries. (Tr. 396.)

On October 17, 2011, plaintiff visited Dr. Jeffries. Plaintiff complained of back pain following participation in a horse play incident with her brother-in-law in August. Dr. Jeffries noted that plaintiff complained of ongoing back pain, right lower extremity pain with dysesthesias into her foot. Dr. Jeffries reported that plaintiff was pleasant and cooperative. Dr. Jeffries' treatment plan included a lumbar magnetic resonance imaging scan, as well as gabapentin and a future injection to treat her pain. (Tr. 439–41.)

On November 3, 2011, plaintiff went to the Boone Hospital Center for a lumbar MRI. Chad Ruble, M.D., interpreted the MRI and documented his impression as follows:

> Large right paracentral/lateral recess disk herniation is identified. . . . This displaces the right descending S1 nerve roots, and is the cause of the patient's right S1 radiculopathy. There is severe right sided L5-S1 neural foraminal narrowing. There is moderate to severe left-sided L5-S1 neural foraminal narrowing.

(Tr. 357–59.)

On November 14, 2011, plaintiff saw Dr. Jeffries. Plaintiff complained of substantial right lower extremity pain with dysesthesias into her foot. Dr. Jeffries' treatment plan included a steroid injection and a follow-up appointment in one month. (Tr. 434–35.) Plaintiff then saw Amir H. Fallahian, M.D., at Boone Hospital Center. Dr. Fallahian performed a lumbar interlaminar epidural steroid/anesthetic injection under fluoroscopic guidance. Dr. Fallahian noted that plaintiff's pain decreased after the procedure. (Tr. 432–33.)

On December 21, 2011, plaintiff again saw Dr. Jeffries. Plaintiff rated her pain as a 4 out of 10 and that she wanted surgical intervention. Dr. Jeffries referred plaintiff to Theodore J. Choma, M.D., for consideration of surgical intervention. (Tr. 423–24.)

Plaintiff also saw Dr. Choma on December 21, 2011. Dr. Choma noted that plaintiff had significant right lower extremity radiculopathy and right L5-S1 large disk herniation, which were refractory to oral medications and had only partial relief with injections. Dr. Choma reported that he discussed the right L5-S1 laminotomy with microdiskectomy procedure with plaintiff and that plaintiff consented to the procedure. (Tr. 415–16.)

On December 23, 2011, plaintiff visited Harry B. Stephenson, APRN, at Columbia Regional Hospital Spine Clinic for a preoperative assessment. Nurse Stephenson noted that plaintiff's prescribed medications included the following: albuterol (to treat asthma), aspirin, fluoxetine, hydroxyzine, ibuprofen, loratadine (to treat allergies), and metformin. (Tr. 409–14.)

On December 27, 2011, Dr. Choma performed a right L5-S1 laminotomy with microdiskectomy. Dr. Choma documented the preoperative and postoperative diagnoses as right L5-S1 herniated nucleus pulposus with radiculopathy. Dr. Choma discharged plaintiff from the hospital the next day with a discharge condition of stable and improved. (Tr. 400–04.)

On January 13, 2012, plaintiff visited Dr. Choma. He reported that plaintiff had an "excellent resolution of her right lower extremity pain." (Tr. 446–47.)

On January 27, 2012, plaintiff visited East Central Missouri Behavioral Health Services for an assessment with a clinical social worker. The social worker noted that plaintiff had a chief complaint of anxiety and depression. The social worker reported that plaintiff was not a suicide risk and there was no risk of harm to others. The social worker further documented that plaintiff had frequent communication with her family. The social worker noted that plaintiff was cooperative and had an appropriate affect, appropriate eye contact, logical flow of thought, and no hallucination or delusions. (Tr. 452–58.)

On February 15, 2012, plaintiff returned to Wilbers Family Care Clinic. Nurse Swoboda noted that plaintiff was feeling stressed. Nurse Swoboda, under the direction of Dr. Wilbers, discontinued plaintiff's prescription for Prozac and instead prescribed Paxil (an antidepressant) and gabapentin. (Tr. 483.)

On February 21, 2012, plaintiff presented to Wilbers Family Care Clinic with a chief complaint of bleeding at her incision site. The assessment and plan are largely illegible. (Tr. 484.)

On February 29, 2012, plaintiff again returned to Wilbers Family Care Clinic for an evaluation of her incision. Nurse Swoboda noted that plaintiff was "undergoing a tremendous amount of stress" and documented the following: "[Plaintiff is] actually [] is coping quite well. She has been able to express her fears and concerns and able to talk. . . . I think she is perfectly normal under the circumstances." (Tr. 482.)

On March 29, 2012, plaintiff visited Wilbers Family Care Clinic for a follow-up appointment. The report is mostly illegible. (Tr. 481.)

On June 13, 2012, plaintiff visited Wilbers Family Care Clinic for review of various tests performed in May. The provider noted that plaintiff was not able to get an appointment at the Arthur Center for three months. Plaintiff reported difficulty dealing with her anxiety. However, the provider documented that Paxil was really helping plaintiff. Both the treatment plan and the identification of the provider were illegible on the documentation. (Tr. 479.)

On June 16, 2012, plaintiff returned to East Central Missouri Behavioral Health Services for a psychiatric evaluation related to stress and anxiety. Veneta Raboin, MSN, under the direction of Ahmed Taranissi, M.D., increased plaintiff's Prozac dose to 80mg, decreased the Paxil dosage to 20mg for one week, and ordered Paxil to be discontinued the following week. (Tr. 459–62.)

On June 20, 2012, plaintiff visited Wilbers Family Care Clinic complaining of right hip pain and right groin pain. The provider documented that the treatment plan included seeing Dr. Jeffries as soon as possible. (Tr. 478.)

On August 29, 2012, plaintiff visited Wilbers Family Care Clinic with a complaint of her ears itching. Nurse Swoboda noted that plaintiff's back surgery was "somewhat successful." (Tr. 477.)

On December 7, 2012, plaintiff returned to Wilbers Family Care Clinic and requested medication refills. Nurse Swoboda documented "obvious . . . inconsistent [medication] use." In her assessment, Nurse Swoboda noted right hip pain, depression, flea bites, obesity, and insulin resistance. Nurse Swoboda refilled plaintiff's paroxetine (Paxil), Flexeril (a muscle relaxant), Zyrtec (for allergies), and metformin. She also increased the gabapentin dosage. (Tr. 476.)

## B. Plaintiff's Testimony in the Administrative Law Judge Hearing

The ALJ held a hearing on March 4, 2013 in Columbia, Missouri. (Tr. 26–70.) Plaintiff and her counsel appeared and plaintiff testified to the following facts. Plaintiff lives in a double-wide mobile home with her daughter and a senior citizen (a family friend). She has a GED and attended college for one year. Plaintiff previously worked as a cook, cashier, rail car cleaner, and factory cleaner. Plaintiff also worked at an auto auction marking cars for sale and doing title work in an office. Plaintiff applied for unemployment benefits in 2009 and received the unemployment benefits for approximately one year. (Tr. 26–41.)

Plaintiff stopped working in 2009 due to having a hard time focusing. Plaintiff testified she was discharged because of her attendance. (Tr. 39.) Plaintiff performs household chores in exchange for a reduction in rent. (Tr. 41–42.) Plaintiff chose December 13, 2009 as the onset date of her disability because on that date she had a "mental breakdown." (Tr. 38.) Plaintiff believes she cannot work inside at a sit-down job because she feels overwhelmed. (Id.)

Plaintiff reads books and watches television. (Tr. 43.) She also uses the computer for Facebook, geology, and games. She also goes swimming and walking with her family, and she can walk about half a mile. (Tr. 44, 57.) Plaintiff is able to get dressed, shower, and put on her own socks and shoes by herself. She also cooks basic meals. (Tr. 45.) She goes grocery shopping and occasionally goes to Walmart. (Tr. 46.) She testified that she does not vacuum or sweep because it hurts. (Tr. 47.) Plaintiff has a driver's license and has recently driven a vehicle. (Id.)

Plaintiff takes Prozac for her depression. She testified that it does help and that she does not have any side effects. (Tr. 51.) She also takes Paxil which also helps. (Id.) Plaintiff takes gabapentin for her lower back and leg pain but that does not help. She takes Vistaril for anxiety which works "pretty good." (Tr. 52.) Plaintiff also takes medications for allergies, heartburn, and insulin resistance. (Tr. 52–53.)

Plaintiff stated she has lower back pain and that she cannot feel her legs when sitting. (Tr. 54.) She had surgery which relieved "a lot" of the pain. (Id.) Plaintiff said she has dull pain and pressure. (Id.) She no longer sees an orthopedist. (Tr. 55.)

Plaintiff also sees a psychiatrist every couple of months. (Id.) Plaintiff does not get counseling and has never seen a counselor. She said she has panic attacks twice a month. (Tr. 56.)

Plaintiff testified that she can walk about half a mile, sit for twenty to thirty minutes at a time, and can lift twenty pounds. She can also climb stairs on a good day. (Tr. 57.)

### III. DECISION OF THE ALJ

On March 25, 2013, the ALJ found plaintiff not disabled. (Tr. 9–21.) The ALJ found that plaintiff met all the insured status requirements through September 30, 2011. (Tr. 11.) At Step One of the prescribed regulatory decision-making scheme, the ALJ found that plaintiff has not engaged in substantial gainful activity since December 13, 2009, the alleged disability onset date. (Id.) At Step Two, the ALJ found that plaintiff has the following severe impairments: obesity, residual effects from L5-S1 laminotomy, major depressive disorder, and posttraumatic stress disorder. (Tr. 12.)

At Step Three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or was medically equivalent to an impairment on the Commissioner's list of presumptively disabling impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 12–14.) Additionally, the ALJ found that plaintiff's mental impairments do not satisfy the "paragraph B" criteria or the "paragraph C" criteria.[2] (Id.) The ALJ found that plaintiff has only mild restrictions living her daily life, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Tr. 13.) The ALJ also found that plaintiff had experienced no episodes of decompensation of extended duration. (Tr. 14.)

Before considering Step Four, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work. (Tr. 14.) Specifically, the ALJ found that plaintiff could do the following: occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl. (Id.) The ALJ further found that plaintiff is limited to simple and routine work with occasional contact with supervisors, coworkers, and the general public. (Id.)

---

[2] "Paragraph B" and "paragraph C" criteria are listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

At Step Four, the ALJ found that plaintiff could not perform any of her past relevant work. (Tr. 19.)

At Step Five, the final step in the sequential process, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff can perform with her age, education, work experience, and residual functional capacity. (Tr. 20–21.) The ALJ concluded that plaintiff had not been under a disability, as defined in the Social Security Act, from December 13, 2009 through the date of the decision. (Tr. 21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140–42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i) – (iii). If the claimant is not working, has a severe impairment, but does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.

Step Four requires the Commissioner to consider whether the claimant retains the Residual Functional Capacity (RFC) to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

### A. ALJ Evaluation of Medical Opinion Evidence

Plaintiff argues that the ALJ improperly evaluated the medical opinion evidence, and thus, the hearing decision was not supported by substantial evidence. Specifically, plaintiff argues that the ALJ formed her own medical opinion regarding plaintiff's impairments and did not give proper weight to the opinion of Londa Swoboda, plaintiff's treating nurse practitioner. The undersigned disagrees.

Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)–(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). Likewise, an ALJ may appropriately rely on non-examining opinions as part of her RFC analysis. See Hacker v. Barnhart, 459 F.3d 934, 935, 939 (8th Cir. 2006) (holding that an ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Id.

Here, the ALJ properly considered the opinion of Nurse Swoboda and found her opinion about nonemployability unpersuasive. The ALJ properly determined that Nurse Swoboda is not an acceptable medical source as defined by agency regulations. See 20 C.F.R §§ 404.1513(a), 416.913(a). Thus, Nurse Swoboda's opinion may be considered, but it is not entitled to controlling weight. See Social Security Ruling 96-2p (holding that for an opinion to be entitled to controlling weight it must come from a treating source as defined by 20 C.F.R. §§ 404.1502 and 416.902).

Additionally, Nurse Swoboda's opinion that plaintiff would be off-task for twenty percent of the day was outside the expertise of a nurse practitioner. A medical provider's statement is given less weigh when the statement does not contain an analysis or provides little explanation. See Toland v. Colvin, 761 F.3d 931, 937 (8th Cir. 2014) (noting that "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements") (citation omitted). Further, a treating provider's opinion that is based upon the provider's understanding of the relevant disability criteria, not on any medical evidence, is not entitled to any deference. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

Here, Nurse Swoboda did not include any medical basis for her opinion and did not cite to any supporting medical findings. Nurse Swoboda's statement about being off-task is a conclusory statement about plaintiff's vocational abilities, not an explanation regarding plaintiff's functionality. A statement about vocational ability is outside the area of her expertise as it assumes she is familiar with all jobs and work environments in the national economy. Given the vague, conclusory nature of Nurse Swoboda's opinion, the ALJ did not err in giving the opinion little weight.

Nurse Swoboda's opinion was also inconsistent with other evidence in the record. An ALJ can give less weight to a medical opinion when it is inconsistent with the evidence in the record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007). Plaintiff reported that she could pay attention all day. (Tr. 19, 250.) Plaintiff's friend also reported that plaintiff had no problems with concentration. (Tr. 240.) Records from mental health appointments show that plaintiff was alert, oriented and cooperative and also had normal flow of thought. (Tr. 463, 464, 466.) Specifically, plaintiff did not report any difficulty with concentration at a mental health appointment on January 27, 2012, and the examination records state that plaintiff was cooperative and not distracted. (Tr. 452, 465.) Thus, the ALJ acted within her discretion to give little weight to Nurse's Swoboda's opinion due to the inconsistencies.

Plaintiff's daily activities further undermine Nurse Swoboda's opinion that plaintiff has seriously impaired concentration. The record indicates that plaintiff was taking care of her four month old granddaughter in August 2011 and was taking care of two grandchildren in August 2012. (Tr. 385, 477.) Additionally, plaintiff assisted an older gentleman who suffered from Alzheimer's disease and was living in her home. (Tr. 482.) The ALJ properly noted the

inconsistencies as a good reason to give less weight to Nurse Swoboda's opinion. See Toland, 761 F.3d at 936 (stating "if a doctor evaluates a patient as having more physical limitations than the patient actually exhibits in her daily living, an ALJ need not ignore the inconsistency") (citations omitted).

Plaintiff's reliance on Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000), to argue that the ALJ engaged in medical conjecture is misplaced. In Nevland, the Eighth Circuit held that the ALJ needed to further develop the record because there was no medical evidence in the record regarding the claimant's ability to function. Id. at 858. Unlike Nevland, plaintiff's record contains sufficient medical evidence from Dr. Jeffries, Dr. Spencer, Nurse Swoboda, and the behavioral health services providers which addresses plaintiff's ability to perform work activity. Moreover, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). Even though the ALJ did not give substantial weight to Nurse Swoboda's opinion, she did acknowledge that plaintiff has some psychiatric conditions that would restrict her to simple and routine work with only occasional contact with coworkers, supervisors, and the general public. (Tr. 14.)

Thus, because the ALJ properly gave less weight to an "other medical opinion" in the record that was not supported by medical evidence and was inconsistent with other information in the record, this court holds that the ALJ committed no error.

### B. ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff also argues that the ALJ erred by comparing plaintiff's earnings record with the amount of SSI benefits she would receive. While plaintiff does not specifically mention credibility, the ALJ made this finding in process of determining plaintiff's credibility, and the court evaluated plaintiff's argument in this context.

A plaintiff's credibility is "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). The ALJ must seriously consider a claimant's subjective complaints and must give good reason for discrediting a claimant's testimony. Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). When analyzing the credibility of a claimant's subjective complaints, the ALJ is to consider all of the evidence presented relating to subjective complaints. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Specifically, the ALJ

examines the claimant's prior work record; observations made by third parties and treating and examining physicians; the claimant's daily activities; precipitating and aggravating factors; functional restrictions; the dosage, side effects, and effectiveness of medication; and the duration, frequency, and intensity of the pain. Id.

Prior work history is one of the Polaski factors that an ALJ must consider in determining plaintiff's credibility. See id. An ALJ may discount a claimant's credibility based upon the claimant's poor work record prior to the cessation of employment and the period of alleged disability. See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (concluding that the plaintiff's work history that included fairly low earnings and significant breaks in employment casts doubt on plaintiff's credibility).

An ALJ can also discount a claimant's credibility based upon the presence of a strong element of secondary gain. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996) (allowing an ALJ to determine credibility based on a strong element of secondary gain).

Here, the ALJ speculatively commented as follows:

> With her history of low earnings, the claimant *may possibly* receive more in supplemental security income than she earned from employment in all but the last six of her last 17 years of employment (Exhibit 5D1). This further reduces the credibility of the claimant's allegations regarding the severity of her condition.

(Tr. 17-18) (italics added.) The duty of the ALJ is to determine whether such a financial hope *actually* taints the claimant's credibility. In the circumstances of this case, more than the ALJ's speculation is required when determining the strength of any financial motive of plaintiff regarding the credibility of her testimony about her condition during her alleged period of disability. The ALJ noted that plaintiff's sporadic work history included earnings at the substantial gainful activity (SGA) level in only six of the past seventeen years of employment. (Tr. 17–18, 182.)

Of more relevance than a speculation about financial gain, as the ALJ noted, is the plaintiff's application for unemployment benefits during the period of alleged disability. The ALJ determined that this fact adversely affected plaintiff's credibility. Although it is not a conclusive factor, "applying for unemployment benefits adversely affects credibility . . . because an unemployment applicant 'must hold himself out as available, willing, and able to work.'"

Smith v. Colvin, 756 F.3d 621, 625 (8th Cir. 2014) (citations omitted); see also Mo. Rev. Stat. § 288.040(1)(2) (2014). Plaintiff received unemployment benefits during her period of alleged disability and made at least three job contacts each week looking for employment. (Tr. 35–36.) By searching for jobs each week and holding herself out as willing and able to work while receiving unemployment benefits, plaintiff's credibility is adversely affected. Thus, the ALJ did not err by considering plaintiff's receiving unemployment benefits in determining her credibility.

The ALJ's credibility determination is supported by substantial evidence on the whole. The ALJ properly considered plaintiff's scope of daily activities, such as taking care of two grandchildren, assisting an elderly friend, reading for leisure, and watching television, under the Polaski factors and weighed them against plaintiff's credibility. See Eichelberger, 390 F.3d at 590 (holding that the ALJ properly discounted plaintiff's credibility when she was the primary caregiver to a grandchild). Additionally, plaintiff's mental status examinations were mostly normal except for a depressed mood and affect, and many of plaintiff's symptoms related to situational stressors including the dissolution of her marriage, financial problems, and concerns about her children. (Tr. 477, 480, 482–83.) Situational depression without functional limitations is not a basis for an award of disability benefits. See Dunahoo v. Apfel, 241 F.3d 1033, 1039–40 (8th Cir. 2001). Further, the ALJ noted plaintiff's back pain responded to treatment, and with the exception of the one surgical procedure, plaintiff has had little treatment—mostly routine and conservative, including inconsistent medication use—for the alleged disabling symptoms. Impairments that are controllable or responsive to treatment do not support a finding of total disability. Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003) (citations omitted).

In conclusion, substantial evidence supports the ALJ's determination.

## VI.     CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce<br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 30, 2015.